**WILLIAM H. BANKS WAREHOUSES, Inc., et al. v. JEAN et al.**

**WATT et al. v. WILLIAM H. BANKS WAREHOUSES, Inc. et al.**

Nos. 2587, 2590.

United States District Court
D. Idaho, S. D.

March 16, 1951.

J. L. Eberle, Boise, Idaho, L. Duncan Lloyd, Chicago, Ill., for plaintiffs.

Frank L. Stephan, Ray D. Agee, Parry, Keenan, Robertson & Daly, Beckwith & Langley, and Rayborn & Rayborn, all of Twin Falls, Idaho, for defendants.

CLARK, District Judge.

The two above entitled actions have been consolidated for the purpose of trial. Number 2587 is an action for a declaratory judgment filed originally in this Court on July 6, 1948 and number 2590 is an action filed in the state court on July 10, 1948 (and removed to this court) to recover the value of beans alleged to have been converted by William H. Banks Warehouses, Inc. (hereinafter referred to as Banks), it being one of the plaintiffs in case No. 2587. The issues are the same in both actions. The facts are substantially as follows:

Banks, the Plaintiff in case No. 2587, is a corporation duly organized and existing under the laws of the State of Illinois with its principal place of business at 209 S. LaSalle Street, Chicago, Cook County, Illinois, and during all times herein mentioned was and is duly authorized to do business in the State of Idaho. Plaintiff John Alfred Halford, in the same case, is one of several persons bound by a contract of insurance issued by Lloyds of London, England, which policy the Court will refer to later.

The defendants and cross-complainants in case No. 2587 are mostly farmers who produced beans which were stored in the warehouses claimed to have been leased and controlled by Banks.

W. Andrew Jean, prior to September 21, 1946 (hereinafter referred to as "Jean") operated a business at Filer, Idaho, and prior to May 28th 1947 also operated a business in Rupert, Idaho, both these businesses consisted of handling beans and other produce, including cleaning grading, storing and selling such produce in warehouses located there. These warehouses were not entirely separate and distinct; they were all owned by Jean and operated under the name "Jean Seed Company". The Filer warehouse was first operated and then the business was extended to Rupert.

The first time we hear of Banks appearing on the Idaho scene was on October 27, 1944, when it started correspondence with the Department of Agriculture of the State of Idaho concerning laws relating to warehousing. In reply to this correspondence, Banks was furnished a copy of the Bonded Warehouse Law of the State of Idaho.

While this correspondence was in progress, Banks, on September 21, 1946, leased a warehouse at Filer, Idaho, as a tenant from year to year or until said tenancy should be terminated by a thirty day written notice. This lease was filed in the public records in the Recorder's office of Twin Falls County, Idaho, in which Filer is located. This lease provided in part:

"This lease is made upon the express conditions following, to-wit:

"First: The said party of the first part covenants that said party of the second part shall quietly enjoy the premises hereby leased; that the said party of the first part will, upon signing of this lease, if desired by said party of the second part, remove, or cause to be removed from said premises, any and all signs that indicate or suggest that the right of possession of said premises is not solely in said party of the second part; and further covenants that said premises are in good repair and in suitable, safe and proper condition for the purposes of the business aforesaid, to the extent of which they shall be so used; that said party of the first part will keep

said premises in said repair and condition during the continuance of this lease; that, if said party of the first part shall fail to keep said premises in said repair and condition, said party of the second part shall, at its option, have the privilege of putting said premises in such repair and condition at the expense of said party of the first part.

"Second: That the said leased premises shall be used and occupied exclusively for the storage of personal property, and for the transaction of such other business as may be connected therewith, or incident thereto, in pursuit of any rights claimed in performance of duties of said warehouseman."

It will be noted that Banks had exclusive control and possession of the warehouse. Four days later, on September 25, 1946, Banks made an application to the Department of Agriculture for a license to conduct a public warehouse at Filer, Idaho. While there was a suggestion in 1 and 2 of that application about field warehousing, paragraph one following the introductory paragraphs asks for a license to conduct a public warehouse. The application is as follows:

"Mr. George Hersley,
Department of Agriculture
State House
Boise, Idaho.

"Dear Sir:

"We have previously applied to you for licenses to operate as Field Warehouseman, through warehouses at Twin Falls, and Caldwell Idaho.

"At this time we are applying for an additional license to operate as Field Warehouseman in Filer, Idaho. In as much as we do not possess any more of the proper forms (Form No. 1), application for license for the conduct of a public warehouse, we are submitting the required information in this letter.

"1. The undersigned hereby applies for a license to conduct a public warehouse located at Filer, Idaho, County of Twin Falls, State of Idaho, under the provisions of the Idaho State Bonded Warehouse Law. Said warehouse is a building, structure, or other protected enclosure for the storage of seed.

"2. The applicant is an Illinois Corporation having an approximate net worth of $43,000.00 and is the lessee of warehouse referred to herein.

"3. There is enclosed a check, payable to the order of the 'Idaho State Department of Agriculture', and to cover fees in the sum of $10.00.

"4. The applicant, as a condition to the granting of the license, agrees to comply with and abide by the terms of the law and regulations so far as same may relate to him, and upon suspension, revocation, or expiration of his license, to deliver all unissued licensed warehouse receipts to the Department. Said receipts to be destroyed by the Department without liability to the warehouseman, one year from date of suspension, revocation, or expiration of the license, provided the said applicant does not authorize destruction prior thereto. (Note: Permission has been given us by your office to issue our own receipt forms) Also, your office has agreed to accept our Lloyd's coverage policies covering our activities in your state.

"5. The name of the Warehouse, and State Number thereof, will be forwarded to you as soon as possible.

"6. The statements made in the foregoing application are hereby certified to be true to the best of the knowledge and belief of the applicant.

"Signed this 25th day of September, 1946.

"William H. Banks Warehouses, Inc.
ELD      By P. H. Caris

"Corporation license tax has been paid for the fiscal year.

"We should appreciate your sending to us a few blank forms—Applications For License for the conduct of a Public Warehouse, so we may have them available for any possible future accounts in your state."

On September 27th, 1946, the State of Idaho issued warehouse license No. 46 as follows:

"State of Idaho
Department of Agriculture
Warehouse License

"State Bonded Warehouse Law License
No. 537                                        No. 46
(Title 67, Chapter 2, Idaho
code Annotated, and any and
all amendments thereto)

"*William H. Banks Warehouse, Inc.* of *Chicago Illinois* is hereby licensed in accordance with the State Bonded Warehouse Law and the regulations for ——— warehouses thereunder to conduct the *Jean Seed Co., Warehouse* located in *Filer,* County of *Twin Falls,* Idaho, from July 1, 1946 to June 30, 1947, and composed of the following: License to certify that William H. Banks Warehouses, Inc. may operate through State Warehouse No. 537. Said warehouseman is authorized to store not in excess of ——— at any one time.

"Where two or more commodities are authorized for storage in this license said warehouseman shall not exceed the ratio of storage with reference to the amount of bond posted as set forth in regulation 2 Section 3, of the rules and regulations at any one time except where the maximum amount of bond is posted.

"This license is subject to modification, extension, suspension or cancellation. It may be terminated by the Commissioner of Agriculture at any time should any warehouseman fail to comply with and abide by the law and said Rules and Regulations as prescribed thereunder by the Department of Agriculture of the State of Idaho.

"In Testimony Whereof, I have hereunto set my hand and caused the official seal of the Department of Agriculture to be affixed in the City of Boise this *27th* day of *September* 1946

"*George Hersley*
Commissioner of Agriculture."

It will be noticed that this license was "in accordance with the State Bonded Warehouse Law."

Prior to the issuance of this license, a certain underwriter at Lloyd's of London, England, issued a warehouseman's bond for Banks insuring said Banks against its legal liabilities. This policy of insurance provides in part that indemnitors agree: " * * to pay to assured and/or holders of warehouse receipts issued by assured and/or to such others as may establish ownership of goods etc., * * * as their interest may appear * * * all sums which assured may become legally liable to pay for damages under their legal liability as warehousemen or bailees as defined in *laws of the various states* (italics mine) of the United States * * * in respect of * * * any goods and/or merchandise and/or property of any description while in or at and/or near premises used for warehouse purposes, owned, leased, controlled and/or occupied by the assured within the limits of the United States."

This bond was filed with the Department of Agriculture of the State of Idaho and approved by it as a condition to the issuance of a license as a warehouseman to Banks. Immediately after Banks received the license and obtained exclusive possession and control of the warehouse at Filer, Banks posted signs and posted them in conspicuous places on the premises. Some of them reading as follows:

"Merchandise in this warehouse covered by warehouse receipts issued by William H. Banks Warehouses, Inc., Bonded. General Offices: Chicago, Illinois. Bonded Custodian on Premises. Do not trespass."

"Branch Warehouse of William H. Banks Warehouses, Inc., Bonded, General Offices: Chicago, Illinois.

"Warehouse Premises No. ——. Leased and Occupied by William H. Banks Warehouses, Inc. General Offices: Chicago, Illinois."

These signs were notice to the public and to all doing business with such warehouse that it was a bonded warehouse.

There never was any interruption in the operation of the Filer warehouse after September 27th, 1946 when license No. 46 was issued to Banks, until after the beans in question here had been converted. However, license No. 46 was for a period from July 1st, 1946 to June 30th, 1947. Banks on June 24th 1947 made another application for a public warehouse license as follows:

**735**

"Application for License for the Conduct of a Public Warehouse. Chapter 2, Title 67, Idaho Code Annotated. State No. 537.

"1. The undersigned hereby applies for a license to conduct a public warehouse located at *Filer*, County of *Twin Falls*, State of Idaho under the provisions of the Idaho State Bonded Warehouse law. Said warehouse is a building structure, or other protected enclosure for the storage of *beans*.

"2. The maximum capacity of the warehouse or portion thereof to be licensed when stored in the customary manner, is: ——— bales of ———, ——— gallons of ———, ——— bu. of ———, ——— cwt. of ———, ——— cases of ———,

"3. The applicant is *corporation* having an approximate net worth of *$69,000* and is the *lessee* of the warehouse referred to herein. (owner, lessee, or otherwise)

"4. There is inclosed a check, payable to the order of the "Idaho State Department of Agriculture," and to cover fees in the sum of $10.00.

"5. The applicant, as a condition to the granting of the license, agrees to comply with and abide by the terms of the law and regulations so far as same may relate to him, and upon the suspension, revocation, or expiration of his license, to deliver all unissued licensed warehouse receipts to the Department, said receipts to be destroyed by the Department without liability to the warehouseman, one year from date of suspension, revocation, or expiration of the license, provided the said applicant does not authorize destruction prior thereto.

"6. The statements made in the foregoing application are hereby certified to be true to the best of the knowledge and belief of the applicant.

"Signed this *24th* day *of June 1947*
"William H. Banks Warehouses Inc.,
By Kessler
Secretary."

"If corporation, use true corporate name as shown in your Articles of incorporation. Has corporation license tax been paid for the fiscal year? *Yes.* If individual or partnership, business or firm name must be recorded with your County Recorder to comply with Section 52–501 of the Idaho Code Annotated. Has This Been Done?" ———.

In 1947 Jean was the owner of another warehouse located at Rupert, Idaho. On May 28, 1947, Banks and Jean entered into an agreement by which Banks became the lessee if this warehouse and the grounds which Jean had leased from the City of Rupert and the Union Pacific Railroad Company. The terms and conditions of this lease (Exhibit 15) were identical to the terms and conditions of the lease Banks had obtained from Jean for the Filer Warehouse. The conditions herebefore set out which were included in the Filer warehouse lease were also contained in this lease. By the express terms of the agreement, Banks had the right to the exclusive possession and control of the Rupert warehouse.

A few months later as the bean harvest approached Banks made application to the Department of Agriculture for a license for the conduct of a public warehouse at Rupert. The terms of this application are set out as follows:

"Application for License for the Conduct of a Public Warehouse.

"Chapter 2 Title 67, Idaho Code Annotated. State No. 575.

"1. The undersigned hereby applies for a license to conduct a public warehouse, located at Rupert, County of Minidoka, State of Idaho under the provisions of the Idaho State Bonded Warehouse Law. Said warehouse is a building, structure, or other protected enclosure for the storage of beans and seed.

"2. The maximum capacity of the warehouse or portion thereof to be licensed when stored in the customary manner, is: ——— bales of ———, ——— gallons of ———, ——— bu. of ———, ——— cwt of ———, ——— cases of ———, 80,000—100 # bags.

"3. The applicant is (Corporation) having an approximate net worth of $69,000 and is the lessee of the warehouse referred to herein. (owner, lessee, or otherwise)

"4. There is inclosed a check payable to the order of the "Idaho State Department of Agriculture", and to cover fees in the sum of $10.

"5. The applicant, as a condition to the granting of the license, agrees to comply

with and abide by the terms of the law and regulations so far as same may relate to him, and upon the suspension, revocation, or expiration of his license, to deliver all unissued licensed warehouse receipts to the Department, said receipts to be destroyed by the Department without liability to the Warehouseman, one year from date of suspension, revocation, or expiration of the license, provided the said applicant does not authorize destruction prior thereto.

"6. The statements made in the foregoing application are certified to be true to the best of the knowledge and belief of the applicant.

"Signed this 12th day of August 1947
"William H. Banks Warehouses Inc.,
By J. H. Kessler,
Secretary"

The foot-note contained at the end of the application for a warehouse license has no application here.

The licenses applied for were not actually issued until the second day of April 1948, which licenses were as follows:

"State of Idaho, Department of Agriculture Warehouse License
State No. 537 Bonded Warehouse Law, License No. 220 (Title 67 Chapter 2, Idaho Code annotated, and any and all amendments thereto)

"William H. Banks Warehouses Inc., of Chicago Illinois is hereby licensed in accordance with the State Bonded Warehouse law and the regulations for bean warehouses thereunder to conduct the Jean Seed Company located in Filer, County of Twin Falls, Idaho, from July 1, 1947 to June 30, 1948 and composed of the following: Frame warehouse 120 x 60 x 14, less cleaning and picking rooms, located between the fairgrounds and the railroad track. Said warehouseman is authorized to store not in excess of capacity at any time.

"Where two or more commodities are authorized for storage in this license said warehouseman shall not exceed the ratio of storage with reference to the amount of bond posted as set forth in regulation 2 section 3 of the rules and regulations at any one time except where the maximum amount of bond is posted.

"This license is subject to modification, extension, suspension or cancellation. It may be terminated by the Commissioner of agriculture at any time should any warehouseman fail to comply with and abide by the law and said Rules and Regulations as prescribed thereunder by the Department of Agriculture of the State of Idaho.

"In Testimony Whereof, I have hereunto set my hand and caused the official seal of the Department of Agriculture to be affixed in the City of Boise this 2nd day of April, 1948

"D. A. Stubblefield
Commissioner of Agriculture".

The Rupert warehouse license was substantially identical to the Filer license except in the portion that will be set out below:

"State of Idaho Department of Agriculture Warehouse License.
State No. 575          License No. 217
Bonded Warehouse Law.
(Statute Cited)

"William H. Banks Warehouses Inc., of Chicago, Illinois, is hereby licensed in accordance with the State Bonded Warehouse law and the regulations for bean and seed warehouses thereunder to conduct the Jean Seed Company located in Rupert, County of Minidoka."

There was no interruption in business during this whole period and both licenses provided for the Jean Seed Company Warehouse.

While Banks was operating as above set out at Filer and Rupert, some of the defendants and counter-claimants in case No. 2587 and some of the plaintiffs in case No. 2590 all of whom are farmers, produced beans and stored them in such warehouses. There was no difference in the mode of storing and handling the beans as far as the bean growers were concerned; they continued the practice of hauling their beans to the Jean Seed Company warehouses and did business with the Jean Seed Company as they had in the past and did no worrying about it until they found their beans were converted. In these actions they seek recovery of their value.

After case No. 2587 was filed in this Court and with full knowledge of the claims

of the defendants and cross-complainants in case No. 2587 and the claims of the plaintiffs in case No. 2590, and after this Court had jurisdiction of the issues as set forth in case No. 2587, Banks made application to the District Court of the Third Judicial District of the State of Idaho in and for the County of Ada for an alternative writ of mandate. This action was brought against D. A. Stubblefield, Commissioner of Agriculture for the State of Idaho to require him to strike from said licenses the words "Jean Seed Company." None of the bean growers involved in the cases then pending in the Federal Court with Banks were made parties, although it is manifest from issues presented in the cases before the United States District Court (No. 2587 and No. 2590) that a legal controversy was involved which would effect all the bean growers (parties in the above numbered cases), Stoner v. Carter, 48 Idaho 745, 285 P. 470.

In conformity with the Judgment of the State Court, exhibit No. 11, License No. 220, was re-written by the Commissioner of Agriculture in words as follows:

"State of Idaho, Department of Agriculture Warehouse License, Bonded Warehouse Law.                                Amended 220 (Title 67, Chapter 2 Idaho Code Annotated and any and all amendments thereto) State No. 537                                No. *328

"William H. Banks Warehouses Inc., of Chicago, Illinois, is hereby licensed in accordance with the State Bonded Warehouse Law and the Regulations for bean warehouses thereunder to conduct the ~~JEAN SEED COMPANY~~ Wm. H. Banks Warehouses Inc., Warehouse located Filer, County of Twin Falls, Idaho, from July 1, 1947 to June 30, 1948, and composed of the following: Frame Warehouse 120 x 60 x 14, less cleaning and picking rooms, located between the fairgrounds and the railroad track. Said warehouseman is authorized to store not in excess of capacity at any one time." (The remainder of the license is identical with license No. 220 herebefore set out in full.)

The warehouse license on State Warehouse No. 575 was also re-written by the State Court. The changes will be shown in that part of exhibit No. 36 that is set out as follows:

"State of Idaho, Department of Agriculture Bonded Warehouse Law. (Statute cited) State No. 575                                Amended 217

"William H. Banks Warehouses, Inc., of Chicago, Illinois, is hereby licensed in accordance with the State Bonded Warehouse Law and the regulations for Bean and Seed Warehouses thereunder to conduct ~~JEAN SEED COMPANY~~ Wm. H. Banks Warehouses, Inc., Warehouse located in Rupert, County of Minidoka, Idaho, from July 1, 1947 to June 30, 1948 and composed of the following:" etc.,

During the trial the Court reserved ruling on several questions, including the admissibility of the opinion, findings and judgment in the State Court in Banks v. Stubblefield. The Court will admit this evidence, however, without considering it binding on the Court as to the issues in this case.

In the case filed in this Court a valid controversy is disclosed as between the bean growers and Banks. It is a startling proceedings that Banks, after having this Court assume jurisdiction of the dispute, should go into the State Court without making any of the parties here parties in that suit and obtaining judgment which attempts to take away all the rights of the bean growers under the licenses and bond that was in existence at the time they delivered their beans (over $50,000. worth) to Banks Warehouse. Banks had the Filer license in its possession. It was issued to the corporation to conduct the Jean Seed Company warehouse, Exhibit No. 8, from September 27, 1946 to June 30, 1947 and the renewal of that license from April 2, 1948 until it was amended in the State Court. The latter license was based on the application of June 24, 1947. No attempt was made to have this license, or the license issued for the Rupert warehouse, amended until June 25, 1948. (The earlier license issued for the Filer Warehouse in 1946, Exhibit No. 8, was not amended. The attempt to amend the licenses was long after the bean growers here had parted with their beans and it

would appear clearly that there was no other purpose in asking for, and obtaining, the amendment except to defeat their liability under the licenses and bond on file which was notice to these bean growers and the public that beans stored in the Jean Seed Company Warehouse were the responsibility of Banks and were protected by their bond. If there were any errors that would excuse Banks they could have been presented to this Court which had already assumed jurisdiction of the controversy between the parties. It was manifest from the issues presented to the State Court that a legal controversy was involved which if adjudged in the mandamus proceeding would necessarily effect a great many farmers that had toiled through the heat of the day raising thousands of dollars worth of beans and who had stored them in the warehouses of Banks called the Jean Seed Company warehouse. While I have admitted this evidence, the Court is of the opinion it does not affect any rights of the bean growers which they had before the amendment. To hold otherwise would make a mockery of justice and cause innocent people to suffer without ever having had their day in Court. The bean growers had a right to rely on, and Banks is bound by, the licenses as they were before amendment. Other objections to testimony the Court will pass over.

On the threshold of this inquiry we find that Banks made an application for and procured a license to operate a public warehouse in Filer, Idaho, and was the warehouseman under the terms of the Bonded Warehouse law. A year later, after a similar application, Banks procured a license to operate a public warehouse at Rupert.

Idaho Code Sec. 69–202 defines various terms used in the bonded warehouse law.

"Terms defined.—The term 'public warehouse' or 'warehouse' as used in this chapter shall be deemed to mean every building, structure, or other protected inclosure in which any argricultural produce is received for storage or transfer; such warehouses are hereby declared to be public utilities.

"The term 'agricultural product' wherever used in this chapter shall be deemed to mean grains dry peas, dry beans, leguminous seeds, hay, potatoes, fruit, honey, eggs, dried, canned or preserved fruit, canned vegetables, canned fish, meat, poultry, dairy products, wool and feeds (not including minerals) or any of them.

"The term 'person' includes a corporation or partnership or two or more persons having a joint or common interest.

"The term 'warehouseman' means a person operating or controlling a public warehouse.

"The term 'receipt' means a warehouse receipt."

The Bonded Warehouse Law as stated by counsel for the bean growers provides that a public warehouse cannot be lawfully operated without the warehouseman first having procured a license from the Department to do so, I.C. Sec. 69–204, gives the Department broad supervisory powers over such warehouses, I.C. Sec. 69–205, requires the applicant for a license, as a condition to the granting thereof, to agree to comply with and abide by all the terms of the Bonded Warehouse Law and the rules and regulations prescribed by the Department thereunder, I.C. Sec. 69–206, requires the applicant to furnish an adequate bond, containing such terms and conditions as the Department shall prescribe, I.C. Sec. 69–208, gives the injured person a right of action on such bond, I.C. Sec. 69–209, prohibits the designation of any such warehouse as being bonded or the use of any name or description conveying the impression that it is bonded until such bond has been furnished, I.C. Sec. 69–210, the exact text of this provision is as follows: "Designation of warehouse as bonded warehouse.—Upon the filing with and approval by the department of agriculture of a bond, in compliance with this chapter, for the conduct of a warehouse, such warehouse shall be designated as bonded hereunder; but no warehouse shall be designated as bonded under this chapter, and no name or description conveying the impression that it is so bonded, shall be used, until a bond, such as provided for in section 69–208, has been filed with and approved by the department of agriculture, of this state or of the United States, and

if such bond has been filed with and approved by the department of agriculture of the United States, until satisfactory proof thereof be filed in the department of agriculture of this state, nor unless the license issued under this chapter for the conduct of such warehouse remains unsuspended and unrevoked."

Further provisions of the law of Idaho prevent the warehouseman from discriminating between its customers the rate to be charged for its services, I.C. Sec. 69–212, gives the person having products stored therein the right to inspect them, I.C. Sec. 69–213, Provides for the employment of inspectors by the Department to inspect such warehouse, I.C. Sec. 69–214, gives the Department power and authority to suspend or revoke any license for the violation of the warehouse law or the rules and regulations prescribed by the Department, I.C. Sec. 69–216; 69–218, requires the warehouseman to receive for storage without discrimination any agricultural product of the kind customarily stored therein by him which may be tendered to him, I.C. Sec. 69–218, requires the warehouseman to issue warehouse receipts for all stored products, I.C. Sec. 69–222, requires the warehouseman to safely keep complete and correct records of all products stored in the warehouse and withdrawn therefrom, I.C. 69–226, authorizes the Department to examine the products stored, I.C. Sec. 69–227, gives the Department the power and authority to make rules and regulations for the purpose of carrying into effect the bonded warehouse law, I.C. Sec. 69–221, makes it a criminal offense to forge, alter, counterfeit, simulate, or falsely represent, or without authority use, any license issued by the Department or to violate or fail to comply with certain provisions of the statutes, I.C. Sec. 69–233, and specifically makes them public utilities, I.C. Sec. 69–202. These warehouses are also made public utilities under the general laws, relating to public utilities. I.C. Sec. 61–129.

In the case of Lebrecht v. Union Indemnity Co., 53 Idaho 228, 22 P.2d 1066, 1069, 89 A.L.R. 640, in speaking of an allied subject, namely, Dealers in Farm produce, the Supreme Court aptly said: "A consignor, as defined, parts with his produce in large quantities, by selling and delivering the same to the broker, dealer, or merchant without getting his pay for the same, who, in turn disposes of the produce and invariably receives his money. Without the security furnished under the act, the consignor would have to rely entirely upon the financial standing, honesty, and integrity of the broker, dealer, or merchant, that he will be honestly dealt with. *Sharp practices and financial instability were often times found to exist, causing the consignor to suffer loss, which, undoubtedly, prompted the passage of the act."* (Italics mine.)

█ The intent of the legislature is free from doubt. It intended to enact a law, which would protect the producers of agricultural products, and prevent such products from being converted or embezzled after they had been delivered to the warehouse. It provided this protection by making it impossible for any warehouse to be lawfully operated or to receive such products unless and until the warehouseman was licensed and placed under the supervision and control of the Department and the depositors protected by an adequate bond. It did not intend to leave any loophole, which would make it possible for a warehouse to be conducted without this protection having been supplied. It is in the light of this obvious intent of the legislature that these statutes should be construed.

█ There is no dispute that the beans of the growers involved in this action were received for storage in each of the warehouses during the time Banks was controlling the warehouses. Under the Idaho statute the term "warehouseman" means a person operating or controlling a public warehouse. Sec. 69–202, Idaho Code. It is well understood that the term "person operating * * * a public warehouse" is the person in immediate charge of it, and a person "controlling a public warehouse" is the person having the ultimate power and authority to direct, govern, supervise and regulate the manner and method in which the warehouse shall be operated. Banks

controlled the warehouses. It had the responsibility in connection with them, and when you examine the statutes it is certain that the Legislature intended to place the responsibility on the person or corporation who held the permission from the State to operate them. Examination of the Bonded Warehouse Law makes it clear that the Legislature intended it to be the public policy of this State that no warehouse for the storage or transfer of agricultural products should ever be operated unless the owners of such products were protected by an adequate bond and the operation of the warehouse had been placed under the supervision and control of the Department. The warehouseman must be liable to the person depositing his product therein. The Idaho Code sec. 69-203 provides: "Before a person can lawfully operate a public warehouse and/or weigh and grade agricultural produce in this state, he must procure licenses under this chapter".

Under this section, it is only the licensee, who can lawfully operate a public warehouse.

Idaho Code Sec. 69-206, is, in part as follows: "The department of agriculture is authorized, upon application to it, to issue to any warehouseman a license for the conduct of a warehouse * * * provided * * * that such warehouseman agree, as a condition to the granting of the license, to comply with and abide by all the terms of this chapter and the rules and regulations prescribed hereunder."

It will be noted that it is the person, who bcomes the licensee, who must agree, as a condition to the granting of the license, to comply with and abide by all the terms of this chapter and the rules and regulations prescribed thereunder.

Idaho Code, Sec. 69-208, provides, in part as follows: "Each warehouseman applying for a license to conduct a warehouse in accordance with this chapter shall, as a condition to the granting thereof, execute and file with the department of agriculture a good and sufficient bond".

It is the person, who becomes the licensee, who is required to furnish the bond as a condition to the granting of the license, and such bond is required for the purpose of carrying out the intent of the Legislature to protect the owners of agricultural products.

Idaho Code, Sec. 69-222, is, in part, as follows: "For all agricultural products stored in a warehouse licensed under this chapter original receipts shall be issued by the warehouseman conducting the same".

The Legislature, as stated by counsel for the bean growers, has carefully and painstakingly enacted these laws for the protection of owners of agricultural products and, in order to insure such protection, it has required that all persons receiving such products for storage or transfer shall be licensed by the Department and shall be under the jurisdiction of the Department and also that he shall file an adequate bond for the protection of such owners. Now, if one person can procure a license to operate a public warehouse and turn the warehouse over to some irresponsible, unbonded person to operate, and let such person operate it, without any responsibility or liability on the part of the licensee, then we have no effective bonded warehouse law, as this will leave the door open for the by-passing of the entire enactment, which the Legislature has so carefully enacted for the protection of the producers of agricultural products, and such warehouses will be operated without any protection to the producers by bond or otherwise, and without being under the supervision or control of the Department. Such was clearly not the intent of the Legislature and such is clearly not the law. Most assuredly the Legislature never intended to leave any such loop-hole in the Bonded Warehouse Law, and when it defined the term "warehouseman" to mean the person "controlling" the warehouse, it clearly meant the person procuring the license to operate the warehouse, and intended to make such licensee and its bondsmen liable for all losses of agricultural products while in the warehouse.

1. No other license was applied for or issued to operate a warehouse at Filer or Rupert.

2. No public warehouse would, or could, have been operated in either if Banks had not made an application for and procured the license to operate such public warehouse.

3. If Banks saw fit to permit another person to operate such, as it now claims, it is just as liable to each defendant for the conversion of his beans as though Banks had itself been operating the warehouse. Any other conclusion would do violence to these statutory provisions.

The same rule is announced in numerous cases, that a person to whom a license or permit has been issued is the person to whom the law will look during the conduct of the business and will hold responsible for compliance with the statutory provisions. Lyman v. City Trust Safe-Deposit and Surety Co., 166 N.Y. 274, 59 N.E. 903; Midland Valley Railroad Company v. Benjamin Toomer, 62 Okl. 272, 162 P. 1127, L.R.A.1917D, 344.

It is contended by counsel for Banks that these licenses to Banks had no effect. The bond, as herebefore mentioned, was continued on file with the Department in compliance with the Bonded Warehouse Law and as a condition to granting the license. This bond covered the entire period in question here and met all the requirements of the statutes. The Department approved each warehouse as being suitable for the storage of beans and each was permitted to operate throughout the entire license year 1947–1948, without any objection thereto, and it had permitted the Filer Warehouse to be conducted under Banks' license for the 1946–1947 license year. In each application, Banks requested a license to operate each warehouse for the entire period from July 1, 1947 to June 30, 1948, and each license was issued to cover that entire period of time. It is true that the licenses were not actually issued until April 2, 1948 (Ex. 11 and 12). However, there is no evidence in the entire record to show any reason for the delay and the licenses were issued without any further action on the part of Banks. See 53 C.J.S., Licenses, § 59, page 713; Fossett v. Rock Island Lumber and Mfg. Co., 76 Kan. 428, 92

P. 833, 14 L.R.A.,N.S., 918; Boise Ass'n of Credit Men v. Seawell, 47 Idaho 473, 276 P. 318.

The operation of a warehouse is a legitimate business activity and the legislature did not intend to prohibit but only to regulate such business.

After Banks had made each application and paid the fee, it conducted its warehouse business in each warehouse during the entire time involved. During the 1946–1947 license year it conducted its operation at the Filer warehouse and on the expiration of that license year it continued conducting its business there during the next license year 1947–1948. It must also be remembered it kept its signs posted whereby it publicly advertised that the warehouse was bonded, as set forth earlier in this opinion.

As previously said, it does not appear why the issuance of the licenses were delayed after application therefor, but it is clear that there was not a delay in the operation of the warehouses caused thereby.

If this time that elapsed between the application for the license and the issuance is material, it is not compatible with the position of Banks that the amendment of the licenses ordered by the judgment of the State Court governs between the date of application and the issuance of the licenses.

It is the opinion of the Court that Banks was the licensee of these warehouses at all times after the application and they are in no position to deny it, and for the following reasons:

1. A timely application was made for the license.

2. The bond was approved.

3. Banks had the right to exclusive possession of the warehouses during this time.

4. They posted signs in the Filer warehouse during all the time that the produce in the warehouses was bonded and that it was "leased and occupied by William H. Banks Warehouses, Inc.," and other like signs.

5. There was no forfeiture of $50.00 per day for each day's operation as required by statute, Idaho Code, 69–204. Compliance was sufficient to protect Banks from being convicted for a criminal offense for failure to have a license and was sufficient to enable it to enforce its contracts, which were made prior to the issuance of the license, when, in the absence of such compliance, the failure to have a license would have been a complete defense to an action on such contracts. If such compliance was sufficient to protect Banks in its own affairs, then it necessarily follows that such compliance likewise imposed upon it all of the duties, obligations and responsibilities of a licensee, as it would be most unreasonable to construe the law to mean that Banks was the licensee for the protection of itself, and not such licensee when the rights or interests of the defendants, who were innocent depositors, are involved. It is clear that it is not the mere formality of the issuance of the licenses, which gave Banks the status of a licensee, but it was its full compliance with the requirements of the law that gave it that status. The licenses were merely evidence to show that Banks had complied with the law, and, when issued, they related back to the time of its compliance with the statutes.

6. They received produce at the warehouses.

■ The only reasonable construction that can be placed on the statutes pertaining to warehouses is that where a timely application is made for a license and the Department does not promptly issue the license, or does not promptly deny the application, then the rights of the warehouseman to conduct his business commences in such a time so that he can operate his warehouse, and that such rights shall continue until the end of the license year or until the Department by some affirmative action terminates his right to operate. Banks was operating during the entire period under the law. Certainly there is no act of Banks to warrant the Court in holding otherwise and it would be an outrage on justice, after these bean growers had parted with possession of their beans by storing them in the warehouses in question here and having their beans converted, for Banks to say under the facts here that it was not the licensee but instead a violator of the law in all of its operations at these warehouses.

■ As to the contention of Banks that it was conducting field warehouses, the Court can find nothing in the Bonded Warehouse Law to authorize or permit field warehouses to operate but, on the contrary, the law provides that every warehouse in which agricultural produce is received for storage or transfer is a public warehouse and the Banks Licenses were for a public warehouse. I repeat Idaho Code, Section 69–202, which provides in part as follows: "The term 'public warehouse' or 'warehouse' as used in this chapter shall be deemed to mean every building, structure, or other protected inclosure in which any agricultural produce is received for storage or transfer . * * * such warehouses are hereby declared to be public utilities."

This is the only statute that defines either the term "public warehouse", "warehouse", or "warehouseman". These words, as used therein, make impossible the operation of any other kind of warehouse for the storage or transfer of agricultural produce.

These statutes—Idaho Code, Sec. 69–202; 69–203 and 69–206 made it very clear that the person who receives such produce in the building for which he has procured a license under this chapter is a warehouseman of a public warehouse. I again state that a field warehousing business has no place under the statutes of the State of Idaho. Any warehouse of whatever kind or description for storage of agricultural produce is a public warehouse and the person conducting such warehouse is the warehouseman therein. To hold otherwise would mean that the producer would never know whether the person to whom he delivered his property was the agent of the person with whom he actually intended to store his produce. Agreements could be drawn that were private between the persons doing business in the same warehouse such as existed between Banks and Jean. (exhibit A) Such agreements could de-

stroy the very certainty and safety which the Legislature has so carefully provided by the Bonded Warehouse Law for the protection of the farmer. It will be noticed that the lease, (exhibit No. 16) was made public by recording while exhibit A, the agreement between Banks and Jean, was, you might say, a secret between themselves. As contended by counsel for the bean growers, an analysis of these statutes makes it definitely certain that the bonded warehouse Act specifically indicates that every warehouse in which an agricultural produce is received for storage or transfer is a public warehouse, that any attempt to conduct a field warehouse for such purposes is in violation of the law, and that any agreement providing for or relating to field warehousing for the storage or transfer of agricultural products is an attempt to evade the mandatory provisions of the Bonded Warehouse Law and is an illegal contract. Hence, plaintiff's contention that Banks was only operating field warehouses is without merit and is no defense to the claim of any defendant.

Banks complied with the Idaho Bonded Warehouse Law and operated and was in control of each warehouse, at Filer and at Rupert, as a public warehouseman. Banks is liable to the bean growers for the losses sustained by them.

In addition, it can be said that Banks is estopped to deny that it operated the warehouse as a public warehouse. For by all of its acts, representations and conduct as hereinbefore set forth, it held out and represented to the public, including the bean growers involved in this action, that it was operating each warehouse under the name of the "Jean Seed Company," and that each warehouse was operated as a public warehouse under the laws of the State of Idaho. These actions create an estoppel of a general public nature, involving and operating in favor of the State of Idaho and the public, which includes the bean growers here.

Under these undisputed facts, Banks is estopped to deny that it operated either of these warehouses as a public warehouse, under the name of Jean Seed Company, and is estopped to deny liability to any defendant herein. To hold otherwise where Banks' actions were such as hereBefore set forth would permit it to work a grievous and substantial fraud upon the defendant bean growers.

Banks should have clearly understood that its actions and representations would be acted upon by the Commissioner of Agriculture, the public and the bean growers involved here. The State, the public and the bean growers had a right to rely on these representations. To allow Banks to assert a contrary position and say that these warehouses are not public warehouses conducted by it under the name of Jean Seed Company would be to say to the bean growers, you have stored your beans in what you believed to be a public warehouse; your beans have been converted; you have lost your year's work. There is no bond to resort to and you must accept your loss amounting in this case to several thousand dollars. Banks cannot now claim to avoid payment for these beans on the grounds that either warehouse was not a public warehouse or that it did not operate as such.

There is also evidence of an extensive advertising campaign that was carried on for the purpose of inducing producers to store beans in these warehouses, especially in the Rupert warehouse. The wording in these advertisements that would catch the eye are set out as follows: "Our warehouses are bonded by the largest warehouse bonding company in America; this assures you of full protection in our buying and selling operation." (The above statement was contained in each of the advertisements and appeared in bold type.)

In the Times-News advertisement the following appeared: "We Are Proud To Announce The Opening Of Our New Bean And Pea Warehouse And Processing Plant .....Located In Rupert, Idaho," which was followed by a big picture of the Rupert Warehouse.

"Below—Our Large Modern Plant Which We Have Been Operating Successfully For a Year At Filer, Idaho," Which

was followed by a big picture of the Filer warehouse. In the Minidoka County News, the advertisement stated: "Bean And Pea Warehouse And Processing Plant Of The Jean Seed Company in Rupert, Idaho"

Which was also followed by a picture of that warehouse. A large picture of the Filer warehouse was shown, which was followed by this comment: "Another fine plant of the Jean Seed Company operating for several years at Filer, Idaho, serving over 800 farmers in the Twin Falls and Filer Communities. These two plants employ over 170 men and women daily, putting a large payroll in your community."

All of this advertising was carried on in the name of Jean Seed Company and, on each picture, the name of JEAN SEED COMPANY appeared in big letters.

Under the evidence here it can be said that at least Banks did nothing to refute such ads. The evidence is slight as to Banks' knowledge of the advertisements but certainly with it having control of these warehouses and having licenses to operate them, in the name of Jean Seed Company, it should have known what was being advertised in connection with its licensed warehouses. Certainly these advertisements would give persons dealing with the warehouse a feeling of security that they could do so without loss.

"Sometimes the silence of a party, when he ought in justice and good conscience to speak up, is as dangerously misleading and as disastrous to an innocent party as downright false and fraudulent representation". Farber v. Page and Mott Lumber Co., 20 Idaho 354, 118 P. 664, 666. These advertisements indicated that the two warehouses were conducted as a single operation. They told the public that the warehouses were bonded by the largest warehouse bonding companies in America. Banks' bond was the only bond in force on these warehouses. Some of the employees of Banks read the advertisements. Knowledge must be imputed to Banks. The evidence is sufficient to estop it from denying that the statements in the advertisements were not true.

The estoppel is a great deal stronger at the Filer warehouse. In addition to the matter herein before set out pertaining to the Rupert warehouse, Banks had signs posted in conspicuous places on and about the Filer Warehouse. A copy of these signs are set forth earlier in this opinion as exhibits 18, 28, and 27. These signs were kept posted during all the time involved in this case. There can be no question but that the representations, contained in these signs were definite and certain representations, which were diametrically inconsistent with and repugnant to the facts, which plaintiffs now attempt to assert, namely, that Banks did not operate that warehouse as a public warehouse under the name of Jean Seed Company. These signs were kept posted by Banks with both the intention and expectation that the information contained therein would be acted upon by all persons, who saw them as they were posted and kept posted by Banks for the very purpose of soliciting persons to bring their agricultural products to that warehouse and do business with Banks.

These signs standing alone under the circumstances here are sufficient to estop Banks from denying its liability but as contended by the attorneys for the bean growers when these representations are considered together with the fact that Banks made an application to the Department for a license to operate a public warehouse in these buildings, and the fact that it procured a license to do so, based upon the representations and promises contained in its application and the fact that it leased said buildings under leases, which gave it the exclusive possession of and control over them and gave public notice thereof by recording such leases, and the fact that Banks did operate a public warehouse in said building, and the fact that it was the warehouseman in such warehouse, and the fact that it permitted said advertisements to be published, without in any manner advising the public that they were untrue, all as hereinbefore pointed out, it becomes conclusive that plaintiffs are estopped to assert that Banks did not operate the Filer warehouse, as a public warehouse under the

name of Jean Seed Company, and that to permit them to do so would result in the perpetration of the grossest kind of a fraud on each defendant.

The evidence in this case shows that each defendant was the owner of the beans claimed; that they were in the custody of and under the control of Banks as a public warehouseman; that the beans were converted while in such warehouse which was used for warehouse purposes and which were leased from Jean, and controlled and occupied by Banks.

Banks is liable for the payment to the bean growers for the loss of their beans under the Bonded Warehouse Law of Idaho.

The question as to whether Jean was Banks' agent is not controlling here. The main question is: Was Banks the Warehouseman? This must be answered in the affirmative. Banks is liable whether or not Jean was its agent. The fact that the bean growers continued to deliver the beans to Jean at such warehouses is not material.

These products were stored in these licensed warehouses and Section 69–219, Idaho Code, is controlling which section I repeat,—it states: "Any person who deposits agricultural products for storage in a warehouse licensed under this chapter shall be deemed to have deposited the same subject to the terms of this chapter and the rules and regulations prescribed hereunder.".

There are other matters presented that the Court feels are not necessary to pass on. Some of the evidence admitted was objectionable. On each objection that I have given consideration, none of the evidence involved was important to this decision.

The bean growers are entitled to judgment against Banks and its bondsmen as prayed for.

Attorneys for the bean growers will prepare the necessary findings of fact, conclusions of law and judgment, serve copies on opposing counsel and submit the original to the Court for approval.